IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DIANE MCNATT,            )
                                )
           Plaintiff,      )
                                )
      v.                 )      Civil Action No. 05-706-KAJ
                                )
JO ANNE B. BARNHART, Commissioner  )
of Social Security,             )
                                )
           Defendant.     )

---

## MEMORANDUM OPINION

---

Gary C. Linarducci, Esq., 910 W. Basin Road, Suite 220, New Castle, Delaware 19720;
Counsel for Plaintiff.

David F. Chermol, Esq., Social Security Administration, Office of Regional Counsel,
Region III, P.O. Box 41777, Philadelphia, Pennsylvania 19101; Counsel for Defendant.
    Of counsel: Donna L. Calvert, Social Security Administration, Office of Regional
    Counsel, P.O. Box 41777, Philadelphia, Pennsylvania 19101.

---

Wilmington, Delaware
November 28, 2006



**JORDAN, District Judge**

## I.   INTRODUCTION

Before me is a Motion for Summary Judgment (Docket Item ["D.I."] 11) filed by

plaintiff Diane McNatt ("McNatt"), and a Motion for Summary Judgment (D.I. 13) filed by

the defendant, Jo Anne B. Barnhart, Commissioner of Social Security (the

"Commissioner").   McNatt brings this motion under 42 U.S.C. §§ 405(g) and 1383(c)(3),

for review of the Commissioner's decision denying her supplemental security income

("SSI") under 42 U.S.C. §§ 1381 through 1383.   Jurisdiction is proper under 28 U.S.C. §

1331 and 42 U.S.C. § 405(g).   For the reasons that follow, McNatt's motion for

summary judgment (D.I. 11) will be denied, and the Commissioner's motion for

summary judgment (D.I. 13) will be granted.

## II.   BACKGROUND

### A.   Procedural Background

On July 19, 2000, McNatt filed a claim for supplemental security income

payments.   (D.I. 7 at 142.)   She claimed a disability arising from chronic liver disease,

Hepatitis C, varicose veins, methadone maintenance, nerves, and bad circulation.   (*Id.*

at 159.)   On July 11, 2001, the Social Security Administration ("SSA") disapproved her

claim, because it found that her health problems resulted from alcohol abuse.[1]   (*Id.* at

110-12.)   McNatt subsequently filed a Request for Reconsideration with the SSA (*id.* at

---

[1]  42 U.S.C. § 1382c(a)(3)(J) prohibits an award of benefits for disability "if alcoholism or drug addiction would. . .be a contributing factor material to the Commissioner's determination that the individual is disabled."  *See also* 20 C.F.R. § 416.935(b)(1) ("The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.").

113), but her claim was denied again because "alcohol and drug abuse [was] a contributing factor material to a finding of disability." (*Id.* at 115.)   On April 5, 2002, McNatt filed a request for a hearing before an administrative law judge ("ALJ"). (*Id.* at 119.)   On August 5, 2002, the ALJ determined after a hearing that McNatt was not disabled within the meaning of the Social Security Act. (*Id.* at 97.)   McNatt then sought review of the ALJ's decision by the SSA Appeals Council. (*Id.* at 126-28.)   The Appeals Council granted review, vacated the hearing decision, and remanded the case to the ALJ to reevaluate McNatt's claim after giving consideration to additional evidence. (*Id.* at 131-33.)   The SSA Administrative Appeals Judge required the ALJ to give further consideration to "all treating and examining source opinions" to determine McNatt's residual functional capacity and "explain the weight given to such opinion evidence." (*Id.* at 132.)   The Appeals Judge also required the ALJ to "[o]btain additional evidence concerning the claimant's polysubstance dependence, hepatitis C, chronic liver disease and depression" to complete the administrative record, and to "[o]btain evidence from a vocational expert to clarify the effect of the assessed limitations" on McNatt's occupational base. (*Id.*)

On February 17, 2004, the ALJ held a supplemental hearing (*id.* at 77-90), and, thereafter, he again rendered a decision against McNatt. (*Id.* at 33-47.)   On August 13, 2004, McNatt requested that the Appeals Council review the ALJ's second decision. (*Id.* at 7.)   The Appeals Council denied her request. (*Id.* at 7-9.)   Thus, the ALJ's decision became the final decision of the Commissioner of Social Security. *See* 20 C.F.R. §§ 404.955, 404.981, & 422.210(a); *see also Sims v. Apfel*, 530 U.S. 103,

106-07 (2000) (holding that if the Appeals Council denies request for review, the ALJ's decision becomes the Commissioner's final decision); *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001) (same).  McNatt now seeks review by this court under 42 U.S.C. § 405(g).

   B.    *Facts*

McNatt was born on September 7, 1960.  (D.I. 7 at 147.)  She was thirty-nine when she first filed her claim for supplemental security income payments (*id.* at 142), and was forty-three on the date of the ALJ's final decision.  (*Id.* at 29.)  McNatt has a twelfth-grade education.  (*Id*. at 60.)  She has intermittent work experience in food service.[2]  (*Id*. at 148-53.)  McNatt's FICA earnings statement indicates that she has not worked since 1990.  (*Id*.)  She claims that she stopped working in 1991, because she could not walk.  (*Id.* at 159-160.)

   1.    *Medical Evidence*

Kent County Counseling Services records and doctors' reports indicate that McNatt has a history of substance abuse, including use of heroin, cocaine, marijuana, nicotine, alcohol, opiates, and barbiturates.  (*Id.* at 272.)  McNatt reported a history of deep vein thrombosis while pregnant.  (*Id*. at 197.)  In 1995, she underwent an Endoscopic Retrograde Cholangio Pancreatography ("ERCP") – a procedure to investigate her complaints of abdominal pain and her abnormal liver function tests.  (*Id.* at 193, 197.)  While the ERCP was normal (*id.* at 193), a contemporaneous

---

   [2]  McNatt claims she worked as a fitness instructor, in construction as a flag person and drywall finisher, and as a medical assistant (D.I. 7, at 442), but these positions are not corroborated by her FICA earnings record.  (*Id*. at 148-53.)

3

examination reported "bilteral chronic leg edema" and a "dilated common bile duct." (*Id.* at 195.)

McNatt was diagnosed with Hepatitis C in 1998. (*Id.* at 205, 212.) She reported that she stopped using heroin in 1994 (*id.* at 272), but the record indicates that she continued to use it during 1998 and into 1999. (*Id.* at 273.) During that time, McNatt was attending a methadone clinic, which was assisting her efforts to overcome her heroin addiction. (*Id.* at 206-13.) As late as February of 1999, she had a positive drug screen. (*Id.* at 273.) In addition, she was abusing alcohol. (*Id.*) In March 1998, McNatt underwent alcohol detoxification (*id.* at 273), but kept consuming beer and continued to use drugs. (*Id.* at 273-74.) On July 7, 1999, McNatt underwent a hepatobiliary ultrasound, an ultrasound guided liver biopsy, and a chest examination. (*Id.* at 222-23.) Her hepatobiliary ultrasound reported liver enlargement and common duct dilation, but her chest examination proved normal. (*Id.*) The final diagnosis of her liver biopsy was "suggestive of chronic active hepatitis." (*Id.* at 231.) On July 11, 1999, McNatt was treated at the Bayhealth Medical Center Emergency Department for "right upper quadrant and epigastric discomfort." (*Id.* at 226.) An Emergency Department physician reported that he found "no masses" and "no rebound tenderness" in her abdomen, concluding that her extremities were "without edema or cyanosis." (*Id.*)

On July 13, 1999, McNatt reported to Christiana Hospital, where she complained of abdominal pain. (*Id.* at 236.) After a physical examination, the physicians determined that she was intensely jaundiced, and her abdomen showed moderate epigastric tenderness and mild distention. (*Id.*) McNatt told the doctors that she had a

4

history of heroin abuse, was on methadone maintenance, and consumed approximately five to six beers a day. (*Id.*) An ultrasound examination of her gallbladder revealed that her gallbladder was distended with sludge, and that there was intrahepatic and extrahepatic biliary dilation. (*Id.*) An ERCP confirmed that McNatt had a dilated common bile duct. (*Id.*) The doctors performed laparoscopic surgery to remove her gallbladder. (*Id.*) On July 17, 2000, Dr. Azhar Khan examined McNatt as part of her application for Delaware public assistance benefits. (*Id.* at 214.) Dr. Khan diagnosed her as having chronic liver disease. (*Id.*) He also completed a questionnaire indicating that she would be unable to work for more than twelve months. Dr. Khan's medical certification was accompanied by limited treatment notes and evaluations to support his findings.

McNatt was hospitalized at the Charter Rockford Center from December 29, 2000 to January 5, 2001 for major depression, alcohol abuse, opiate substance dependency, and a personality disorder. (*Id.* at 275.) Upon admission, her Global Assessment of Functioning ("GAF") score was twenty-five.[3] (*Id.* at 280.) The attending

---

[3] The GAF score measures psychological, social, and occupational functioning levels of an individual. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000). According to the *Diagnostic and Statistical Manual of Mental Disorders*, a GAF score of twenty-one to thirty suggests a serious impairment in communication and judgment, or a severe inability to function. *Id.* at 34. A GAF score of forty-one to fifty suggests that the patient has serious symptoms, or a serious impairment in social, occupational, or school functioning. *Id.* A GAF score of fifty-one to sixty indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. *Id.*

GAF scores have been recognized as evidence bearing on a claimant's eligibility for SSI benefits. *See, e.g.*, *Wood v. Barnhart*, No. Civ.05-0432-SLR, 2006 WL 2583097, at \*12 (D. Del. Sept. 7, 2006); *McManus v. Barnhart*, No. 03-800-GMS, 2004 WL 2212026, at \*5 (D. Del. Sept. 27, 2004).

5

physician indicated that she admitted to drinking twelve to eighteen beers a day. (*Id.* at 276.) While admitted, McNatt was treated with individual, group, and activities therapy, and she participated in a drug and alcohol program. (*Id.* at 277-78.) Her GAF score was fifty upon discharge. (*Id.* at 275.)

On January 29, 2001, Nancy Culver, a Registered Nurse with the Methadone Program at Kent County Counseling Services, indicated in a letter to the Delaware Disability Determination Service that McNatt's alcohol consumption remained a problem, and her urine drug screens were "positive on occasion for marijuana, benzodiazepines, and opiates."[4] (*Id.* at 274.)

On April 20, 2001, Dr. Irwin Lifrak conducted a physical examination on McNatt and reported the results to the Delaware Disability Determination Service a few days later. (*Id.* at 329.) McNatt complained she was suffering from hepatitis, emotional depression, and pain and swelling in both her upper and lower extremities. (*Id.* at 329.) In Dr. Lifrak's report, he stated that McNatt was not in acute physical distress and could ambulate without the aid of an assistive device. (*Id.* at 330.) But she did display a "mild degree of limp favoring the left lower extremity." (*Id.*) She could get on and off the examining table without assistance and was able to perform tasks with her hands that required dexterity. (*Id.* at 330-31.) His examination revealed a soft abdomen, active bowel sounds, and a liver and spleen that were not palpably enlarged. (*Id.* at 331.) He indicated that McNatt might suffer from degenerative joint disease and venous

---

[4] The letter is dated January 29, 2000, but that is apparently a typographical error, since the letter describes treatment provided to McNatt from July 1994 to January 2001. (D.I. 7 at 272-74.)

6

insufficiency, which would explain McNatt's pain in her upper and lower extremities. (*Id.* at 332.) He found that her range of motion was reduced in the area of the lumbosacral spine and both hips. (*Id.* at 331.) He indicated that McNatt would be able to perform activities that would require her to "sit for a total period of five to six hours and stand for a total period of 2-3 hours." (*Id.* at 332.) In addition, he determined that McNatt could lift weights of up to ten pounds with either hand on a regular basis. (*Id.*)

On May 10, 2001, Dr. Patricia Lifrak[5] conducted a psychiatric exam of McNatt and later reported the results to the Delaware Disability Determination Service. (*Id.* at 335-38.) During that exam, McNatt claimed that she had no problems getting along with people when she worked, but that she was terminated from her jobs for attendance problems caused by her drug abuse. (*Id.* at 337.) She complained of poor concentration and "panic attacks." (*Id.* at 335.) Although she admitted to suicidal ideation, she denied suicidal intentions or plans. (*Id.* at 336.) Dr. P. Lifrak gave McNatt a GAF score of fifty-five to sixty, stating that McNatt's condition was still affecting her ability to function. (*Id.* at 338.) She rated McNatt's social and psychiatric impairments generally as mild to moderate, but indicated that the impairment of her ability to "perform work requiring frequent contact with others" and the "established degree of restriction of daily activities" was moderately severe. (*Id.* at 340.)

In July 2001, McNatt lost her take-home methadone privileges because of her alcohol abuse. (*Id.* at 268.) She subsequently requested a reduction in her methadone

---

[5] To distinguish Dr. Patricia Lifrak from Dr. Irwin Lifrak, she will be referred to as "Dr. P. Lifrak" and he will be referred to as "Dr. I. Lifrak."

dose, despite the fact that the staff disapproved of that decision. (*Id.*)  As the dose was lowered, McNatt began testing positive for opiates and marijuana. (*Id.*)

On November 5, 2001, Dr. Khan performed a residual functional capacity ("RFC") evaluation of McNatt. (*Id.* at 404, 410.)  Dr. Khan opined that McNatt could stand or walk for one-and-one-half to two hours at a time, but he did not state the total amount of time she could stand or walk in an eight-hour day. (*Id.* at 404.)  He concluded that McNatt could sit up to two hours at a time, for a total of three hours in an eight-hour day, and could lift up to five pounds occasionally. (*Id.*)  He further concluded that she suffered from severe pain four to five days per month due to chronic liver disease. (*Id.*)  He confirmed that she could not perform a sedentary job with a sit/stand option and a three-pound weight restriction on a full time basis, but could on a part-time basis of four to five hours a week. (*Id.*)  Dr. Khan's evaluation, again, was accompanied by limited treatment and assessment notes to support his findings.

On June 13, 2001, another physician conducted an RFC assessment for the SSA, based on all the evidence in McNatt's file. (*Id.* at 342-49.)  The physician concluded that McNatt could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for a total of six hours in an eight-hour workday. (*Id.* at 343.)  The physician provided several explanations why his conclusions differed from those of McNatt's treating physician, Dr. Khan. (*Id.*)  On January 31, 2002, yet another physician conducted an RFC

assessment for the SSA based on McNatt's file. (*Id.* at 386-93.) This additional physician's assessment was not materially different from the one that preceded it.[6]

On June 18, 2001, July 5, 2001, and January 15, 2002, medical examiners conducted psychiatric reviews for the SSA based on McNatt's medical records. (*Id.* at 352-65, 366-70, 371-83.) All three reviewers opined that McNatt's impairments met Listing 12.09 of 20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A, meaning they believed that she suffered from behavioral or physical changes associated with the regular use of substances that affect the central nervous system. (*Id.* at 352, 371, 379.) One examiner commented that McNatt "appear[ed] to be functional except for her substance dependance," and "her biggest impediments to employment appear[ed] to be her polysubstance abuse." (*Id.* at 364.) The other two examiners indicated that drug abuse and alcohol abuse were material to their conclusions. (*Id.* at 367, 383.)

On January 2, 2002, in response to complaints of persistent heartburn, McNatt underwent an upper endoscopy and biopsy at the Christiana Medical Center. (*Id.* at 405.) The procedure revealed "severe bile reflux with hiatial hernia and gastritis." (*Id.*) On August 18, 2003, she submitted to an abdominal ultrasound, which revealed a somewhat enlarged liver consistent with cirrhosis and dilation of the bile duct. (*Id.* at 414-17.)

---

[6] Unlike the first RFC assessment after Dr. Khan's, the second RFC assessment did not include a comparison with Dr. Kahn's findings, since the reviewing physician apparently did not have copies of Dr. Khan's statements regarding McNatt's physical capacities. (D.I. 7 at 392.)

9

On July 12, 2002, Dr. Khan stated in a letter that McNatt's stress and depression were unrelated to her alcohol addiction, but were "caused by outside influences." (*Id.* at 411.) He did not attach supporting evaluations or notes when making this assessment.

On February 9, 2004, McNatt saw physicians at Christiana Hospital regarding swelling and redness in her lower extremities, but reported no headache or dizziness, nor any abdominal pain. (*Id.* at 428.) She underwent an echocardiogram and a venous duplex examination at Christiana, which indicated the presence of deep vein thrombosis in her lower legs. (*Id.* at 432-34.) McNatt said that she had "a Greenfield filter implanted so as to prevent future occurrences of pulmonary emboli" (*id.* at 450), but the records submitted from that visit do not indicate that such a procedure was performed.

On May 5, 2004, Plaintiff underwent a psychiatric evaluation by Frederick Kurz, Ph.D. (*Id.* at 441-49.) McNatt stated that she was not taking the medications prescribed for depression, because she was concerned about their effects on her liver. (*Id.* at 441.) She claimed that she stopped using alcohol in 2003. (*Id.* at 442.) During the examination, McNatt spoke in sentences that were "relevant and goal-directed" with no articulation problems and no indications of "hyperactivity, distractibility or impulsivity." (*Id.* at 443.) She was able to write simple sentences, perform basic arithmetical tasks, and follow three-step commands. (*Id.*) Dr. Kurz stated that her polysubstance abuse was in remission. (*Id.* at 444.) He determined that she suffered from a recurrent major depressive disorder and a cognitive disorder. (*Id.*) Dr. Kurz gave McNatt a GAF score of fifty-five (*id.* at 444), and generally indicated that she suffered from moderate impairments in social or occupational functioning. (*Id.* at 446-47.) However, Dr. Kurz

10

rated the impairment of McNatt's ability to "sustain work performance & attendance in a

normal work-setting" and to "cope with pressures of ordinary work" as moderately

severe. (*Id.* at 447.)  He indicated that McNatt had moderate restrictions in her ability to

understand and carry out short, simple instructions as well as detailed instructions, and

to make judgments on simple, work-related decisions. (*Id.* at 448.)  He also indicated

that McNatt had moderate restrictions in her ability to interact appropriately with the

public, supervisors, and co-workers, as well as in working under pressure or in

responding to changes in a routine work setting. (*Id.* at 449.)

On the same day, Dr. I. Lifrak re-evaluated McNatt. (*Id.* at 450-59.)  He stated

that the liver was not palpably enlarged (*Id.* at 452), and there was no evidence of

active deep vein thrombosis, though he did note evidence of superficial variscosities in

her lower extremities. (*Id.* at 452-53.)  He opined that McNatt would be able to sit for a

period of six to seven hours and stand for a period of four to five hours in an eight-hour

day, while taking the usual and customary breaks. (*Id.* at 453).  Additionally, he

assessed that McNatt would be able to lift up to ten pounds with either hand on a

regular basis. (*Id.* at 453.)

### 2.     The ALJ's Decision

To determine whether a claimant is entitled to social security disability benefits,

an ALJ applies a sequential five-step inquiry pursuant to 20 C.F.R. § 404.1520.

*Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir.2000).

> Under that five step analysis, the [ALJ] determines first whether an
> individual is currently engaged in substantial gainful activity.  If that
> individual is engaged in substantial gainful activity, he will be found not
> disabled regardless of the medical findings.  If an individual is found not to

11

be engaged in substantial gainful activity, the [ALJ] will determine whether the medical evidence indicates that the claimant suffers from a severe impairment. If the [ALJ] determines that the claimant suffers from a severe impairment, the [ALJ] will next determine whether the impairment meets or equals a list of impairments in Appendix I of sub-part P of Regulations No. 4 of the Code of Regulations. If the individual meets or equals the list of impairments, the claimant will be found disabled. If he does not, the [ALJ] must determine if the individual is capable of performing his past relevant work considering his severe impairment. If the [ALJ] determines that the individual is not capable of performing his past relevant work, then she must determine whether, considering the claimant's age, education, past work experience and residual functional capacity, he is capable of performing other work which exists in the national economy.

*Brewster v. Heckler*, 786 F.2d 581, 583-84 (3d Cir. 1986) (citations omitted); *see also* 20 C.F.R. § 404.1520(a)(4).

In applying this five-step analysis, the ALJ determined that McNatt was not disabled within the meaning of the Act. (D.I. 7 at 19.) After determining that McNatt was not engaged in substantial gainful activity (*Id.* at 23), the ALJ found that McNatt's "hepatitis C, chronic liver disease (cirrhosis), deep vein thrombosis, a major depressive disorder, a generalized anxiety disorder, a personality disorder, and a cognitive disorder [were] considered 'severe' within the meaning of the Regulations. . . ." (*Id.* at 23.) But the ALJ determined that these impairments did not meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (*Id.*)

Nor did the ALJ conclude, after reviewing the evidence concerning McNatt's substance abuse disorder, that her condition met the severity requirement for disability under Section 12.09. (*Id.*) Section 12.09 relates to behavioral and physical changes affecting the central nervous system resulting from substance abuse disorders. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.09. To satisfy Section 12.09, a claimant must

12

meet one of several other sections listed in the regulation. *Id.* McNatt's conditions implicated Sections 12.04, 12.05, 12.06, and 12.08. (D.I. 7 at 24.) The ALJ immediately determined that McNatt did not meet the criteria under § 12.05 for mental retardation, because the results of her intelligence tests did not indicate such a cognitive deficiency. (*Id.*) The ALJ also determined that McNatt did not meet the functional limitation criteria under §§ 12.04, 12.06, and 12.08, based on the results of consultative evaluations, test results, and assessments, and based on McNatt's statements for the record that described the activities of her daily living. (*Id.*)

The ALJ next determined whether McNatt retained the residual functional capacity to perform either her past relevant work or other work existing in significant numbers in the national economy. (*Id.* at 24.) The ALJ concluded that McNatt had no prior work experience within the past fifteen years that produced earnings at a level of substantial gainful activity. (*Id.* at 26).

In step five, the burden shifts to the SSA to show that there are other jobs existing in significant numbers in the national economy that the claimant can perform, consistent with her residual functional capacity, age, education and work experience. 20 C.F.R. § 404.1520(f); *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). To make that determination, the ALJ considered all of McNatt's symptoms, including pain, and "the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements [under the relevant regulations]." (D.I. 7 at 24.) The ALJ also considered medical opinions

13

rendered about McNatt, McNatt's testimony and written statements for the record, and the opinion of a vocational expert. (*Id.* at 24-28.)

Based on the opinion of Dr. Khan, the psychological evaluations conducted by Dr. Kurz, and McNatt's own admissions, the ALJ concluded that McNatt's substance abuse "is currently in remission and therefore does not cause any functional limitations." (*Id.* at 23.) He further determined that McNatt does not suffer from "'severe' musculoskeletal impairment," because the record did not contain reports of x-rays or other diagnostic studies confirming that diagnosis. (*Id.*)

In deciding McNatt's residual functional capacity, the ALJ found inconsistencies between the opinion of her treating physician, Dr. Khan, and other medical evidence available in the record. (*Id.* at 25.) Dr. Khan opined that McNatt could perform less than a full range of sedentary work for no more than four to five hours a week and could stand no more than two hours at one time during an eight-hour workday. (*Id.* at 25, 404.) However, relying on 20 CRF §§ 404.1527(d)(2) and 416.927(d)(2) and SSR 96-2p, the ALJ decided that Dr. Khan's opinion did not warrant controlling weight, because Dr. Khan's assessments were accompanied by "limited and intermittent treatment notes with few objective findings to support his assessments." (*Id.* at 25.) The ALJ determined that, in contrast, the results of the hospitalizations, the extensive evaluations by Dr. Lifrak in 2001 and 2004, and McNatt's admitted activities of daily living provided "objective analyses of her symptoms and functional capabilities, including a lack of any restriction of upper extremity function precluding lifting ten to

twenty pounds, minimal impairment of gait, and no evidence of more than moderate postural restriction or limitations on lower extremity function." (*Id.*)

From a psychiatric standpoint, even though Dr. Kurz and Dr. P. Lifrak rated some of McNatt's functional limitations as moderately severe, the ALJ concluded that "her psychiatric impairments only moderately impair her ability to sustain mental activities." (*Id.* at 25-26.) The ALJ made that determination because both Dr. Kurz and Dr. P. Lifrak confirmed that her GAF scores were between fifty and sixty, which was consistent with her last psychiatric hospitalization. (*Id.* at 25.) He also made that determination based on McNatt's written statements and testimony regarding her activities of daily living, which he believed reflected no more than a moderate restriction of her ability to function socially and sustain mental activities. (*Id.* at 25-26.)

The ALJ determined that McNatt provided inconsistent statements regarding her functional limitations. (*Id.* at 24.) That is, while McNatt alleged that her physical and psychiatric restrictions limit her ability to perform work-related activities, she also has claimed, by written statements and testimony, that she helps her son get ready for school (*id.* at 168, 173), helps him with his homework (*id.* at 169, 172), prepares simple meals (*id.* at 65, 168, 170), makes the bed (*id.* at 169, 170), does the dishes and the laundry (*id.* at 65, 170), shops for groceries (*id.* at 170), attends a methadone clinic on a daily basis (*id.* at 168), picks up around the house (*id.* at 170), reads the newspaper and daily devotional guides (*id.* at 172), watches television (*id.* at 65, 172), visits with relatives and a friend occasionally (*id.* at 65, 173), and attends parent-teacher conferences. (*Id.* at 24-25, 173.)

15

Thus, after the ALJ reviewed "the more persuasive objective medical findings and functional assessments," McNatt's "less than credible testimony," the results of hospitalizations, and McNatt's admitted activities of daily living, he determined that McNatt had the following residual functional capacity:

> [E]xertionally, she can sit up to six hours in an eight-hour workday, stand and walk up to six hours in an eight-hour workday, and lift weights up to ten pounds frequently and twenty pounds occasionally. Her moderate pain, depression, alleged medication side effect of blurred vision, and her history of alcohol and drug abuse do not preclude her from performing sustained physical and mental activities.

(*Id.* at 25-26).

The ALJ determined that McNatt's ability to perform "all or substantially of the requirements of light work [as defined in 20 C.F.R. § 416.967] was impeded by additional exertional and/or non-exertional limitations."[7]  (*Id.* at 27.)  These include "pain (of the stomach, legs, chest and back), depression, a history of alcohol and drug abuse, and blurred vision as a side effect of her medication."  (*Id.* at 27.)  Considering those

---

[7]  The regulations classify work in the national economy in five ways: sedentary, light, medium, heavy, and very heavy work.  20 C.F.R. § 416.967.  Light work is described as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).

limitations, which only "moderately reduced" her capacity to perform a full range of light work, the ALJ determined that Plaintiff had the residual functional capacity to perform a "significant range of light work," as defined in 20 C.F.R. § 416.967.  (*Id.* at 26, 27.)

The ALJ consulted a vocational expert and asked him to determine if a hypothetical person of McNatt's age, education, past relevant work experience, and residual functional capacity to perform light work with McNatt's limitations could find employment in the national economy, assuming McNatt's described limitations were mild to moderate in nature.  (*Id.* at 27.)  The vocational expert opined that such a hypothetical individual could perform lights jobs as a cleaner/housekeeper (500 in the state and 4,500,000 nationally), a mail clerk (500 in the state and 2,500,000 nationally), and an office helper (1,000 in the state and 4,700,000 nationally).  (*Id.*)  Based on the vocational expert's responses, the ALJ's determination of McNatt's residual functional capacity, and McNatt's age, educational background, and work experience, the ALJ determined that McNatt was "capable of making a successful adjustment to work that exists in significant numbers in the national economy."[8]  (*Id.*)  The ALJ therefore concluded that, within the framework of the Medical-Vocational Rule 202.20, a finding of "not disabled" was warranted.  (*Id.* at 28.)

## III.    STANDARD OF REVIEW

Judicial review of the denial of an application for Social Security benefits is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *see also Plummer v. Apfel*, 186 F.3d

---

[8]  The vocational expert indicated that his testimony regarding these jobs was consistent with the *Dictionary of Occupational Titles*.  (D.I. 7 at 27, 85-86.)

17

422, 427 (3d Cir.1999) ("The role of this Court is identical to that of the District Court,
namely to determine whether there is substantial evidence to support the
Commissioner's decision. The Court is bound by the ALJ's findings of fact if they are
supported by substantial evidence in the record.") (citations omitted). Substantial
evidence is "more than a scintilla. It means such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402
U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. of New York v. NLRB*, 305 U.S.
197, 229 (1938)). The court does not undertake a de novo review of the decision, nor
does it re-weigh the evidence in the record. *Monsour Medical Center v. Heckler*, 806
F.2d 1185, 1191 (3d Cir. 1986), *cert. denied*, 482 U.S. 905 (1987).

## IV. DISCUSSION

McNatt argues that for two reasons I should grant her motion for summary
judgment and award her the benefits she seeks. First, she argues that the ALJ ignored
evidence that substantiated she was disabled under Section 12.09. (*Id.* at 24-25.)
Second, she claims that the hypothetical question posed by the ALJ to the vocational
expert failed to include all of McNatt's relevant limitations. (D.I. 12 at 17-21, 22-23.)
The Commissioner argues that I should grant summary judgment upholding the denial
of benefits, because there was substantial evidence to support the ALJ's determination
that McNatt did not meet the criteria under Section 12.09 (D.I. 13 at 22-33), and that
McNatt retained the residual functional capacity to perform over eleven million unskilled
light jobs existing in the national economy. (*Id.* at 34-37.)

A.    *Section 12.09*

I have concluded that there is substantial evidence to support the ALJ's

determination that McNatt did not meet the criteria under Section 12.09.  Section 12.09

relates to behavioral and physical changes that affect the central nervous system

resulting from substance abuse disorders.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, §

12.09.  To satisfy Section 12.09, a claimant must meet one of several other sections

listed in the regulation.  *Id.*  McNatt's circumstances implicated the criteria under

Sections 12.04, 12.05, 12.06, and 12.08.[9]  After reviewing McNatt's medical

consultative evaluations, test results, assessments, and her statements that described

the activities of her daily living, the ALJ determined that McNatt did not meet the criteria

under any of those sections.  (D.I. 7 at 23-24.)

"When the medical testimony or conclusions are conflicting, the ALJ is not only

entitled but required to choose between them."  *Cotter v. Harris*, 642 F.2d 700, 705 (3d

Cir. 1981).  In making the disability determination, "the ALJ must consider all of the

evidence and give some reason for discounting the evidence [he] rejects."  *Plummer*,

186 F.3d at 429; *see also Stewart v. Secretary of H.E.W.*, 714 F.2d 287, 290 (3d Cir.

1985) (stating that the ALJ must "do more than simply state ultimate factual

conclusions. . .the ALJ must include subsidiary findings to support the ultimate findings"

and must provide "not only an expression of the evidence s/he considered which

---

[9]  Section 12.04 deals with affective disorders, Section 12.05 with mental
retardation, Section 12.06 with anxiety related disorders, and Section 12.08 with
personality disorders.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, §§ 12.04, 12.05, 12.06, &
12.09.

supports the result, but also some indication of the evidence which was rejected"
(internal quotation omitted)).

Here, the ALJ was required to choose between conflicting testimony and
evidence to determine whether or not McNatt met the criteria under Sections 12.04,
12.05, 12.06, or 12.08, and thus might be called disabled under Section 12.09.
Although three medical examiners who reviewed McNatt's medical files determined that
McNatt qualified as disabled under Section 12.09 (D.I. 7 at 352, 371, 379), these
examiners also indicated that drug and alcohol abuse was material to their conclusions.
(*Id.* at 364, 367, 383.)  One examiner commented that McNatt "appear[ed] to be
functional except for her substance dependence," and "her biggest impediments to
employment appear[ed] to be her polysubstance abuse."  (*Id.* at 364.)  The evidence
suggests that McNatt has the ability to control her substance abuse.   McNatt, herself,
claimed that she stopped using alcohol in 2003 (*id.* at 442), and records indicate that
McNatt's polysubstance abuse was in remission.[10]  (*Id.* at 405, 444.)  In light of this

---

[10]  McNatt argues that the ALJ failed to address why, in his first decision, he
found that McNatt had polysubstance dependence (D.I. 7 at 105), but in his second
decision he concluded that her polysubstance abuse was in remission.  (*Id.* at 23; D.I.
12 at 25.)  The ALJ's decision rendered on August 13, 2004 is the final decision of the
SSA, *see* 20 C.F.R. §§ 404.955, 404.981, & 422.210(a); *c.f. Sims v. Apfel*, 530 U.S.
102, 106-07 (2000) (holding that, if the Appeals Council denies request for review, the
ALJ's decision becomes the Commissioner's final decision), and is the only decision I
have jurisdiction to review.  Although there may be a discrepancy in those opinions, I
conclude that there is substantial evidence supporting the ALJ's determination in his
second opinion that McNatt's polysubstance dependence is in remission.  (*See* D.I. 7 at
442 (stating that McNatt herself admitted that she had not used alcohol since
September 2003 because of her liver disorder); *see also id.* at 405 (assessing in
January 2002 that McNatt is a recovering heroin addict and was taking Methadone); *id.*
at 444 (concluding in May 2004 that McNatt's polysubstance abuse was in remission).
It is noteworthy that the ALJ rendered his first opinion before the availability of much of
the evidence that McNatt's polysubstance abuse was in remission.

evidence, a reasonable mind could conclude that substance abuse no longer caused any functional limitations in McNatt, casting doubt on the relevancy of the reports of those three examiners.

In addition, there was other substantial evidence the ALJ relied on to determine that McNatt did not meet the criteria of Sections 12.04, 12.05, 12.06, or 12.08, and therefore did not qualify under Section 12.09.  Both Dr. Kurz and Dr. P. Lifrak gave McNatt a GAF score of fifty-five to sixty (*id.* at 338, 444), indicating that McNatt suffered only moderate symptoms in social or occupational functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000). Additionally, McNatt's written statements and testimony regarding her activities of daily living reflect no more than a moderate restriction of her daily-living activities and ability to function socially.[11]

---

McNatt also contends that the ALJ should have indicated the time that abuse went into remission, and the effect her remission had on McNatt's ability to perform work activities. (D.I. 12 at 25.) The ALJ did take into account the effect the remission had on McNatt's ability to perform work activities. The ALJ asked the vocational expert to "assume that [the hypothetical individual]. . .also suffered from. . .a history of alcohol and drug abuse" when he asked the expert to opine on the existence of jobs in the national economy available for an individual of McNatt's age, education, past relevant work experience, and her residual functional capacity as determined. (*Id.* at 27.) The exact time that McNatt went into remission was irrelevant. The ALJ's responsibility was to determine whether the claimant was disabled pursuant to 20 C.F.R. § 416.902 at the time of the hearing.

[11] McNatt has claimed through written statements and testimony that she helps her son get ready for school (D.I. 7 at 168, 173), helps him with his homework (*id.* at 169, 172), prepares simple meals (*id.* at 65, 168, 170), makes the bed (*id.* at 169, 170), does the dishes and the laundry (*id.* at 65, 170), shops for groceries (*id.* at 170), attends a methadone clinic on a daily basis (*id.* at 168), picks up around the house (*id.* at 170), reads the newspaper and daily devotional guides (*id.* at 172), watches television (*id.* at 65, 172), visits with relatives and a friend occasionally (*id.* at 65, 173), and attends parent-teacher conferences. (*Id.* at 173.)

21

As required, the ALJ chose between the conflicting evidence, *Cotter*, 642 F.2d at 706, and adequately explained why certain evidence had been accepted and why other evidence was rejected.[12]  Because the evidence is such "as a reasonable mind might accept as adequate," *Burnett*, 220 F.3d at 118, I conclude that the ALJ's decision that McNatt did not meet the criteria under Section 12.09 is supported by substantial evidence of record.

      B.     *Hypothetical Questions Posed to the Vocational Expert*

According to *Chrupcala v. Heckler*, 829 F.2d 1269 (3d Cir. 1987), a hypothetical question "must reflect all of the claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Id.* at 1276.  Thus, there must be substantial evidence to support an ALJ's findings that underlie the hypothetical questions posed to the vocational expert.  *See id.* (finding that the ALJ's question was deficient because it was not supported by substantial evidence, and, thus, the expert's answer could not be used as substantial evidence by the court to support the ALJ's determinations).  "Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question of a vocational expert, the expert's response is not considered substantial evidence." *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002).

McNatt argues that the hypothetical question posed by the ALJ to the vocational expert failed to include all of McNatt's relevant limitations.  (D.I. 12 at 17-21.)  The ALJ

---

[12]  The ALJ offered further details as to why McNatt did not meet the criteria under Sections 12.4, 12.05, 12.06, and 12.08, though those details will not be reiterated here. (*See id.* at 23-24.)

consulted a vocational expert and asked him to determine if a hypothetical person with

McNatt's age, education, past relevant work experience, and residual functional

capacity to perform light work with McNatt's limitations could find employment in the

national economy, assuming that McNatt's described limitations were mild to moderate

in nature.[13]  (*Id.* at 84-85.)  McNatt contends that because Dr. P. Lifrak and Dr. Kurz

indicated that McNatt suffered from some limitations that were "moderately severe," and

because three medical examiners opined that McNatt's condition was so severe that

she met the criteria under Section 12.09, the ALJ's hypothetical question was deficient,

and the vocational expert's testimony cannot be considered by the court as substantial

evidence.  (D.I. 12 at 18-21.)  She further argues that because the vocational expert's

testimony cannot be considered by the court as substantial evidence, the SSA has not

met its burden of proof to substantiate that McNatt is capable of performing work

existing in the national economy.  (*Id.*)

---

[13]  Specifically, the ALJ's question was as follows:
> I want you to assume that I would find that the claimant
> would have the residual functional capacity to perform light
> work activity.  She's classified as a younger individual, has a
> high school education, no past relevant work and, under the
> applicable rule and regulation, would be found not disabled.
> In addition, however, I want you to assume that I find that
> she has nonexertional impairments, specifically, pain in
> various body areas that she's indicated here today, notably
> pain in the area of stomach, legs, chest, and back.  She
> experiences mental depression.  She has a history of
> alcohol and drug use and some blurring of vision due to her
> medications.  Now, assume. . .that I would find that the
> nonexertional impairments would exist [and]. . .that they
> would be at the mild to moderate nature. . . .  Now, in light of
> that criteria. . .could she do any of the jobs indicated in the
> regulations?

*Id.* at 84-85.

23

I conclude that there was substantial evidence to support the ALJ's conclusions underlying the hypothetical questions posed to the vocational expert. Thus, it is appropriate for me to consider the vocational expert's response as substantial evidence. *Chrupcala*, 829 F.2d at 1276. In determining McNatt's functional capacity, the ALJ found inconsistencies in the medical testimony and conclusions and, thus, was "required to choose between them." *Cotter*, 642 F.2d at 705. Although Dr. Kurz and Dr. P. Lifrak rated some of McNatt's functional limitations as moderately severe, they both confirmed that her GAF score was between fifty and sixty (*id.* at 338, 444), indicating that McNatt suffered only moderate symptoms in social or occupational functioning. American Psychiatric Association, *supra*, at 34. In addition, both of these doctors rated the majority of McNatt's impairments as mild or moderate (D.I. 7 at 340-41, 446-49), and McNatt's written statements and testimony regarding her activities of daily living reflected no more than a moderate restriction of her daily-living activities and ability to function socially. *See supra* note 8. Although three medical examiners opined that McNatt's condition was so severe that she met the criteria under Section 12.09, these examiners also noted that drug abuse and alcohol abuse were material to their conclusions. (*Id.* at 364, 367, 383.) Because the records indicate that McNatt's polysubstance abuse was in remission (*id.* at 444), a reasonable mind could conclude that substance abuse no longer caused any functional limitations in McNatt, casting doubt on the relevancy of the reports of those three examiners. *See supra* pp. 19-20.

In sum, I conclude that there is substantial evidence to support the ALJ's determination that McNatt's limitations were mild to moderate in nature, validating the

question posed to the vocational expert.  Consequently, I conclude that the vocational

expert's response is substantial evidence to support the ALJ's final conclusion that

McNatt retained the capacity for work that exists in significant numbers in the national

economy and was not disabled as defined in the Social Security Act.[14]

## IV.   CONCLUSION

Accordingly, I will grant the Commissioner's Motion for Summary Judgment, and

will deny McNatt's Motion for Summary Judgment.  An appropriate order will follow.

---

[14]  McNatt's final argument is that the ALJ's hypothetical question failed to include all the relevant limitations as directed by the SSA Appeals Council's order.  (*Id.* at 22-23.)  That is, the SSA Appeals Council directed the ALJ to pose a hypothetical question to the vocational expert that reflected McNatt's inability to "work around unprotected heights or drive/operate machinery" and the ALJ failed to do that.  This argument fails for two reasons.  First, the decision the ALJ rendered on August 13, 2004 became the final decision of the Commissioner once the Appeals Council declined to review it.  *See* 20 C.F.R. §§ 404.955, 404.981, & 422.210(a); *see also Sims*, 530 U.S. at 106-07 (holding that, if the Appeals Council denies request for review, the ALJ's decision becomes the Commissioner's final decision); *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001) (same).  Thus, this court does not have to ensure that the ALJ complied with the Appeals Council's orders.  My responsibility is to determine if the ALJ's decision is supported by substantial evidence.  42 U.S.C. § 405(g).  Second, there is substantial evidence to support the ALJ's decision that McNatt retains the capacity for work that exists in significant numbers in the national economy that does not include work involving unprotected heights or driving/operating machinery.  *See supra* pp. 16, 21-23.